UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVIA WILSON, JEROME WATSON,
DESIREE WILSON, and SHERRE WILSON,

                    Plaintiffs,

          -v-                                                    No. 05 Civ. 10355 (LTS)(DFE)

N.Y.P. HOLDINGS, INC. d/b/a THE NEW
YORK POST,

                    Defendant.

_____


**OPINION AND ORDER**


APPEARANCES:

ROOSEVELT T. SEYMOUR, ESQ.               J. JORDAN LIPPNER, ESQ.
175 Remsen Street, Suite 602                      NEWS AMERICA INCORPORATED
Brooklyn, New York 11201                          1211 Avenue of the Americas
                                                                  New York, New York 10036
*Attorney for Plaintiffs*
                                                                  MICHAEL STARR, ESQ.
                                                                  ALLISON J. SCHOENTHAL, ESQ.
                                                                  HOGAN & HARTSON L.L.P.
                                                                  875 Third Avenue
                                                                  New York, New York 10022

                                                                  *Attorneys for Defendants*


                    LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs Desiree Wilson, Sherre Wilson, Olivia Wilson and Jerome Watson (collectively, "Plaintiffs") bring this employment discrimination action against N.Y.P. Holdings, Inc., d/b/a The New York Post ("Defendant" or the "Post"), which employed each of the plaintiffs during various times from 1999 to the present.  Plaintiffs assert that the Post violated Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), by subjecting them to a hostile work environment and discriminating against them on account of their race and/or gender with respect to the terms and conditions of their employment.  The three female plaintiffs (Desiree Wilson, Sherre Wilson and Olivia Wilson) also assert gender discrimination claims pursuant to New York State Executive Law § 296 et seq. and New York City Administrative Code § 8-107.  The Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court has considered carefully all of the parties' submissions.  For the following reasons, Defendant's motion for summary judgment is granted in its entirety.

Background

Unless otherwise noted, the following material facts are undisputed.  The Post is the owner and publisher of the New York Post, a daily newspaper in New York.  Plaintiffs Desiree Wilson, Sherre Wilson, Olivia Wilson and Jerome Watson have been or continue to be employed as permanent pressman at the Post.  Desiree, Sherre and Olivia are sisters, and all four

plaintiffs are black.  During the time period relevant to this action, 2002 to the present, all four Plaintiffs worked at the <u>Post</u>'s Port Morris facility in the Bronx, New York.

The <u>Post</u>'s pressroom workforce is staffed primarily by the New York Newspaper Pressman's Union Local No. 2 (the "Union").  However, when there is a shortage of Union workers available, the workforce is supplemented with non-union, shift-by-shift workers, known as "Casuals."  (Vincent Aff. ¶¶ 4, 19-20.)  Upon the completion of 110 shifts as a Casual, an employee can be elevated to unionized, permanent press-worker status and become a "Junior."  As long as the Union controlled the hiring and elevation of Casuals, the Casuals who were elevated to permanent status were exclusively white males. (Raymond Walsh Aff. ("R. Walsh Aff.") ¶ 11.)  In February 1998, the <u>Post</u> took over the responsibility for hiring Casuals and created a "Casual List," on which individuals are ranked in an order that corresponds to how often they have worked as a Casual, and the Casual List drives elevation determinations.  As a consequence, non-white and female Casuals have been promoted to permanent status.  (R. Walsh Aff. ¶¶ 21-26.)

When a Casual becomes a permanent press-worker, he is added to the bottom of the <u>Post</u>'s Junior Priority List in the same order that he had been listed on the Casual List.  (R. Walsh Aff. ¶ 31.)  The new Junior is then assigned to one of the <u>Post</u>'s two work shifts, either the "dayside" or the "nightside."  (<u>Id.</u> ¶ 28.)  <u>Post</u> personnel decide how many new Juniors are needed for each shift, and the new Juniors with the highest priority are assigned to the night shift and the remaining, lower-priority Juniors are assigned to the day shift.  (<u>Id.</u> ¶¶ 32-33.)  The newspaper is printed during the night shift and thus the majority of the <u>Post</u>'s pressmen work during the night.  (<u>Id.</u>)  During the day, a smaller group of workers "perform[s] maintenance on

the printing presses and prepare[s] for the evening press-run."  (Id. ¶ 29.)  Occasionally, the Post

prints "circulars and other inserts" during the day, so one press might be running as many as two

days a week during the day shift.  (Id.)  Plaintiffs proffer that the night shift is more desirable

than the day shift, because it provides greater opportunities for skill development as it is during

the night shift that the bulk of the production work is done.  (D. Wilson Aff. ¶ 6.)

        Each pressman is assigned a classification within the Union.  A pressman is

initially classified as a "Junior Pressman" and may subsequently become a "Journeyman

Pressman."[1]  (R. Walsh Aff. ¶ 5.)  Journeymen and Juniors "enjoy different pay grades and levels

of responsibility."  (R. Walsh Aff. ¶ 5.)  To become a Journeyman, an employee must work at

least four years as a Junior and pass a written exam administered by the Union; it is the Union,

not the Post, that serves as the gatekeeper to journeyman status.  In practice, it can take many

more than four years for a Junior to become a Journeyman.  (R. Walsh Reply Decl. ¶¶ 4-5.)

        Various positions during the shifts must be filled by employees with Journeyman

status.  In shifts in which there are insufficient Journeymen, the Post will assign Juniors to be

"Temporary Journeymen," an assignment which allows them to earn a higher rate of pay for that

shift.  (D. Wilson Aff. ¶ 6.)  Temporary Journeyman assignments are made according to the

Junior priority list.  (Def.'s Ex. A.)  One of the positions that must be filled by a Journeyman is

that of "Pressman in Charge" ("PIC"), which also entails a higher rate of pay.  (D. Wilson Aff. ¶

10.)  A PIC is selected from the pool of Journeymen on a particular shift, which includes Juniors

---

[1]    The Collective Bargaining Agreement in force between the Union and the Post at
the relevant time refers to an intermediate employment classification,
"Apprentice," yet the Post proffers that there has not been an apprentice in its
employment for "several decades."  (Vincent Aff. ¶ 18.)  Plaintiffs have proffered
no evidence to the contrary.

serving as Temporary Journeymen.  (R. Walsh Aff. ¶ 59.)

During both the dayside and the nightside shifts, pressmen work either on a "roller crew" or a "maintenance crew."  Pressmen working on the roller crew receive a higher wage than those on the maintenance crew.  (B. Walsh Aff. ¶ 6.)  During the dayside shift, typically one junior works on roller crew and seven on the maintenance crew, while four journeymen work on the roller crew and eight work on the maintenance crew.  (Id.)  The parties disagree as to whether it is necessary for a Junior to work on the roller crew to develop the skills necessary to advance to Journeyman status.

The Post and the Union entered into a Collective Bargaining Agreement ("CBA") on August 20, 2000, which will remain in effect until October 31, 2015.  The Post asserts that, during the time of Plaintiffs' employment with the Post, the terms and conditions of their employment were governed by the CBA.  Plaintiffs maintain that, while their employment was "in part" governed by the CBA, it was also governed by "past practice."  (Pls.' 56.1 Stmt. ¶ 4.)[2]

Plaintiffs broadly allege that the Post discriminates against female and black employees, yet they concede that during the discovery period they have not gathered any statistical information or other evidence with respect to Defendants' disparate treatment of female or black employees generally.  (Pls.' Rule 56.1 Stmt., ¶¶ 11, 20.)  Rather, the general averments in Plaintiffs' affidavits constitute the only proffered evidentiary support for their allegation of widespread discrimination.  Evidence proffered by the Post indicates that it has made considerable efforts to improve diversity in its workplace and to remedy discriminatory

---

[2]     Reference to the parties' statements of material fact submitted pursuant to S.D.N.Y. Local Civil Rule 56.1 incorporate by reference the evidentiary material cited in particular paragraphs.

practices previously practiced by the Union that affected <u>Post</u> employees, and that such efforts have produced measurable gains in race and gender diversity throughout the pressroom. (Vincent Aff. ¶¶ 27-38, R. Walsh Aff. ¶¶ 21-26, Ex. OO; *see generally,* William Bogan Aff.)

<u>Allegations Regarding Individual Plaintiffs</u>

I.     <u>Desiree Wilson</u>

Plaintiff Desiree Wilson began working at the <u>Post</u> as a Casual in late 1999.  In January 2002, Desiree joined the Union and became a Junior.  In January 2005, she filed charges with the New York State Division of Human Rights ("SDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging employment discrimination by the <u>Post</u>.[3]  On an unspecified date, she also filed charges with the National Labor Relations Board ("NLRB"), alleging harassment and unfair discipline by the <u>Post</u>.  The NLRB charges were dismissed in March 2005.  In February 2006, Desiree Wilson took a leave of absence from which she has not returned.

In this lawsuit, Desiree Wilson claims that she was subjected to disparate treatment with regard to the terms and conditions of her employment.  Her disparate treatment claims are based on alleged discrimination in (1) shift assignments; (2) temporary position assignments; (3) task assignments; and (4) severity of discipline.  Additionally, Desiree Wilson claims that she was subjected to a hostile work environment at the <u>Post</u>.

a.     <u>Discrimination in Shift Assignments</u>

Desiree Wilson claims that, despite her "seniority," she was "reassigned" to work

---

[3]     Although Plaintiffs' materials repeatedly refer to the date of the SDHR charge as January 2004, the correct date is January 2005, as is evident from the fact that multiple events listed in the charge took place in late 2004.

on the day shift, which caused her to "lose pay and the opportunity to acquire journeyman skills."

(Compl. ¶ 37.)  The <u>Post</u> does not dispute that, upon promotion to permanent employee status in

January 2002, Desiree Wilson was immediately assigned to the day shift.  (R. Walsh Aff. ¶ 33;

Christine M. Wilson Decl. Ex. ("Def.'s Ex.") MM.)  However, the <u>Post</u> proffers that, as a matter

of policy, at every semi-annual elevation of Casuals to Juniors, the <u>Post</u> determines how many

Juniors are needed in the night shift and the day shift, and then assigns those with the highest

priority rankings to the night shift and the remainder to the day shift.  (R. Walsh Aff. ¶¶ 32-33.)

Of the thirteen employees elevated from Casual to Junior in January 2002, Desiree Wilson was

ranked lowest on the Junior Priority List.  The nine highest-priority new Juniors were assigned to

work the night shift and the four lower-ranked new Juniors were assigned to the day shift.  (<u>Id.</u>)

Among the four employees assigned to the day shift, three were white males, and the fourth was

Desiree Wilson.  Among the nine new night employees, one was a black male, one was a white

female, one was an Asian male and the rest were white males.  (<u>Id.</u>)

    b.  <u>Discrimination in Temporary Position Assignments</u>

    In addition to her assignment to the day shift, Desiree Wilson claims that the <u>Post</u>

discriminated against her with respect to assignments to temporary Journeyman status and the

PIC position.  Desiree Wilson alleges that on September 20, 2002, Gary Sanderson, the night

foreman, disregarded her position as a temporary Journeyman and "instructed [her] to perform

the task of a [Junior]" and he sent her "to pick up rags and papers."  (Roosevelt Seymour Decl.

Ex. ("Pls.' Ex.") 2.)  Additionally, Desiree Wilson asserts that she was repeatedly passed over for

the PIC position, which provides an opportunity to earn a higher rate of pay.  Desiree Wilson

identifies three lower-priority Juniors who were consistently appointed PIC ahead of her from

2002 to 2004.  (D. Wilson Interrog. No. 2.)  In 2002 and 2003, Desiree worked zero shifts as

PIC; in 2004, she worked nine shifts as PIC; in 2005, 71 shifts as PIC.  Desiree Wilson alleges

that she was generally not permitted to work as PIC until she filed her SDHR complaint.

        The <u>Post</u> characterizes the PIC position as "the most responsible position on the

press for a pressman to have," because the PIC operates very expensive and important equipment

and directs the work of other pressman. (R. Walsh Aff. ¶¶ 56-57.)  The <u>Post</u> proffers that, under

the CBA and long-standing practices at the paper, PIC assignments are not made on the basis of

the priority list, but at the foreman's discretion, taking into account the foreman's assessment of

qualifications.  (B. Walsh Aff. ¶ 32; Def.'s Ex. A at 5.)  The CBA provides, "The right of the

Publisher, through the foremen, to designate and direct the work of employees on presses or in

the pressroom on all editions and at all times, is acknowledged by the Union."  (<u>Id.</u>, Ex. A at 5.)

Additionally, the CBA provides that "[t]he office may select any journeyman as pressman-

in-charge provided that on the basis of priority in the pressroom they would be eligible to work

that particular day or night."  (<u>Id.</u> at 8.)

        The <u>Post</u> proffers that Desiree Wilson was regularly appointed as PIC ahead of

higher-priority employees.  (B. Walsh Aff. ¶ 32.)  In 2004 and 2005, Desiree Wilson worked as

PIC ahead of higher-priority white male employees on numerous occasions.  (<u>Id.</u>)  Additionally,

the <u>Post</u> alleges that it was the growth of Desiree Wilson's pressroom experience, rather than her

initiation of the SDHR action, which prompted the increase in the number of her PIC shifts.

        c.    <u>Discrimination in Task Assignments</u>

        Desiree Wilson further alleges that the <u>Post</u> discriminated against her by

"customarily" assigning her to the "most menial and onerous work" in the pressroom and thereby

denying her the opportunity to learn skills that would allow her to be promoted to a Journeyman. (Compl. ¶ 28.)  She alleges that she and other black employees were "generally" assigned to "clean press units with the maintenance crew," as opposed to working on the roller crew or production crew.  (D. Wilson Interrog. No. 11.)  Desiree Wilson identifies five lower-priority white employees who allegedly were regularly placed on the roller crew ahead of her.  (Id. at 8; D. Wilson Dep. at 109.)  She asserts that she was not given the opportunity to acquire Journeyman skills until she filed charges with the SDHR and EEOC.  (D. Wilson Interrog. No. 3.)

Desiree Wilson alleges that, when she began her employment at the Post, the priority of pressmen was respected for job assignments.  She states that, in the early years of her employment, there were several white males who always worked on the roller crew and whose priority was respected.  (D. Wilson Dep. at 111.)  She further alleges that there was an "unwritten rule" about respecting priority for desirable job assignments.  (Id. at 112.)  She claims, however, that "when blacks began coming into the industry and moving up on the shop priority list we [were] told that our priority no longer matters."  (D. Wilson Aff. ¶  7.)

In response to Desiree Wilson's allegations, the Post alleges that the assignment of tasks is based on foreman discretion and that, from the time Desiree Wilson began her employment at the Post in 1999, there was no custom, practice or policy to make roller crew assignments, production assignments, or PIC assignments, based on priority.   The Post has submitted an affidavit from Brian Walsh, a day foreman, who alleges that he gave Desiree Wilson a few opportunities to work on the roller crew, but concluded that "she lacked the mechanical ability for the task, was unwilling to take direction and could not perform well as a

team with other members of the roller crew." (B. Walsh Aff. ¶ 20.)  Therefore, he no longer

assigned her to the task.[4]  (Id.)  In a further affidavit, the Post proffers that, for an eight-month

period in 2004-05, when the day shift was doing production, Desiree Wilson was regularly

assigned to the production crew.  (B. Walsh Reply Decl. ¶¶ 4-5.)  The Post also proffers that at

least two black pressman were regularly assigned to the roller crew during the relevant time

period.  Desiree Wilson's deposition corroborates that factual proffer and also reveals that at least

one woman was assigned to the roller crew.  (B. Walsh Aff. ¶ 22; D. Wilson Dep. at 109, 141.)

      The Post admits that, although the CBA provides foremen with the discretionary

authority to assign pressmen to pressroom jobs, for a period of time an exception obtained with

respect to the roller crew.  (Vincent Aff. ¶ 39.)  Prior to May 2002, "five [high priority] males

would continually assign themselves, or 'bid,' to work on the roller crew." (Id. ¶ 40.)  In May

2002, Joseph Vincent, the Senior Vice President of Operations, found out about this practice of

bidding based on priority.  (Id. ¶ 41.)  Vincent ended the practice immediately and notified the

Union that assignments to the roller crew would be based on foremen's discretion, like all the

other pressroom tasks.  (Id. ¶ 42.)  The Post claims that since this incident, no tasks are assigned

on the basis of a press-worker's priority, (id. ¶ 43), and Plaintiffs do not contest the fact that

foreman discretion, rather priority, determines the assignment of tasks. (Pls.' 56.1 Stmt. ¶ 8.)

---

[4]    In deposition testimony, Superintendent of the Pressroom Raymond's Walsh's only explanation as to how a Junior might acquire the required mechanical skills for the roller crew was through experience on the roller crew, suggesting a hopeless "catch-22 " for the Post's junior pressmen.  (R. Walsh Dep. at 21.)  In an affidavit submitted with Defendant's reply brief, however, Walsh proffers that "an attentive junior with a good attitude who asks questions can learn journeyman skills in many other ways, even if he or she is generally assigned to the maintenance or make-ready crew."  (R. Walsh Reply Aff. ¶ 10.)

       d.      <u>Discrimination in Severity of Discipline</u>

Desiree Wilson alleges that the <u>Post</u> discriminated against her by disciplining her more harshly than white employees.  She asserts that a three day suspension she received on October 3, 2003, for "sharpshooting," was improper and objects to two suspensions she received in 2004 for "carelessness" and "neglect of duty."

The <u>Post</u>'s Office Rules ("Rules"), issued in or about 2003, provide that "Sharpshooting of shifts is not allowed, and will result in discipline."  (Def.'s Ex. G.)  The Rules do not further elucidate the meaning of the term "sharpshooting."  The parties agree that "sharpshooting" refers to the practice of an employee taking an unscheduled day off of work and then working on a scheduled day off, such as a holiday.  Desiree Wilson alleges that taking an unscheduled day off and then working on a vacation day does not constitute "sharpshooting," whereas the <u>Post</u> proffers that there is no such exception for working on an unscheduled vacation day as opposed to any other scheduled day off.[5]  (D. Wilson Dep. at 133, B. Walsh Aff. ¶¶ 34, 36.)

Desiree Wilson considers her sanction for sharpshooting to be improper because she worked on a "vacation" day, not an "off" day.  (D. Wilson Dep. at 133.)  She states, "A lot of people work on their vacation. This isn't anything unusual that occurs at the New York <u>Post</u> . . . People have been working on their vacation for years."  (<u>Id.</u>)  However, the <u>Post</u> claims that the rule is not so narrowly tailored and that Desiree Wilson's interpretation of the rule is not

---

[5]      The attraction of sharpshooting to employees is that working on a day off requires payment of time-and-a-half.  Therefore, by taking an unscheduled day off and then working on a scheduled day off, an employee will work the same number of hours as previously scheduled, but earn more money.

supported by the managers who interpret it.  (B. Walsh Aff. ¶ 36.)  Additionally, the <u>Post</u>

identifies two white male employees who each received three day suspensions for sharpshooting.

(B. Walsh Aff. ¶ 37.)

   In addition to the sharpshooting sanction, Desiree Wilson objects to two

suspensions that she received in 2004.  On October 21, 2004, Desiree Wilson was issued a one

day suspension for "neglect of duty."  On December 29, 2004, she received a five day suspension

for "carelessness."  Desiree Wilson identifies six white male employees who violated the

"neglect of duty" rule, the "carelessness" rule, or both, and allegedly only received verbal or

written warnings.  The number of infractions for each of these men varied from three to eight.

(Pls.' Exs. 6-12.)  Additionally, Desiree Wilson alleges that the subsequent reduction of her total

suspension from six to three days signifies that the original sanctions were incorrect.

   In response to Desiree Wilson's assertions, Brian Walsh, the day foreman, states,

> During 2004, Desiree had been orally warned many times. I had
> warned Desiree that she was working too slowly and needed to work
> faster, or at least at the speed of her co-workers. . . Desiree, did not,
> however, heed these warnings. Sometimes she even seemed to me to
> be 'doggin it,' which is the term we use for someone who works
> deliberately at a slow pace.

(B. Walsh Aff. ¶¶ 39-40.)  Brian Walsh's affidavit also enumerates the interactions he had with

Desiree Wilson about her work performance in 2004.  (<u>Id.</u> ¶ 42.)  He gave her a final written

warning in April 2004, met with her and her Union representative on November 19, 2004, wrote

a caution letter to her on November 23, 2004, and spoke to her on December 10 and 15, 2004,

regarding her careless work.  (Def.'s Ex. CC.)

   Additionally, the <u>Post</u> notes that three of the six employees whom Desiree Wilson

alleges received less severe sanctions actually received harsher sanctions subsequent to their

verbal and written warnings, including suspensions and, in some cases, termination.  (R. Walsh

Reply Decl. ¶¶ 19-25, Def.'s Exs. ZZ-GGG.)  The Post also identifies two black pressmen who

received five and six warnings each, for the same infractions Desiree Wilson committed, without

being suspended for those infractions.[6]  (Def.'s Exs. HHH, III.)  Additionally, the Post proffers

that the Joint Conference Committee frequently elects to reduce imposed sanctions for a variety

of reasons, including its desire to avoid arbitration costs, and that its decision to reduce Desiree

Wilson's six days of suspension does not indicate that the original sanctions were erroneous.

(Vincent Aff. ¶¶ 91-92.)  Lastly, Vincent states that, "[a]t the time Desiree Wilson was

disciplined and throughout the Joint Committee meeting, I never heard the Union suggest that the

Post had imposed this discipline on Desiree because of her race or gender, or that she thought

this was so." (Vincent Aff. ¶ 94.)

> e.     Hostile Work Environment

Desiree Wilson also alleges that she was subjected to a hostile work environment

during her tenure at the Post.  She claims that two foremen made a number of derogatory

comments to her or that were aimed at her.  She alleges that Sanderson, the night foreman, said to

her "a few years back" that "training females is like training a dog" and that he once told her that

"women need to be horsewhipped." (D. Wilson Aff. ¶ 20.)  On a separate occasion, Sanderson

allegedly said, in front of a group of workers that included Desiree, "You would know my wife,

because she is the one who has all the red ink all over her dress."  (D. Wilson Dep. at 24, 29.)

Foreman Kenny Eaton allegedly once said, while alluding to Desiree, "I smell something.

---

[6]     One of those black employees is Plaintiff Jerome Watson, who was terminated for
a different offense.

Whoof." (<u>Id.</u> at 45-49.)

In addition to comments allegedly aimed at her or about her, Desiree Wilson alleges that <u>Post</u> foremen, including Kenny Eaton, referred to black female celebrities as "whores" and "sluts" in front of her, whereas such derogatory terms allegedly were not used in reference to white celebrities. (<u>Id.</u> at 50, 52.) Desiree Wilson also claims that foremen and co-workers referred to female employees as "girls." (<u>Id.</u> at 32.) Additionally, Desiree Wilson alleges that, in 2004, the word "nigger" was written on the locker of a black pressman and in a bathroom. (D. Wilson Aff. ¶ 22.) She heard from third parties about these two incidents, but never saw the offensive writings herself. Also, Desiree Wilson alleges that a fellow pressman told Nytricia Smith ("Smith"), a black female press-worker, that "blacks are only good for playing basketball." (D. Wilson Interrog. No. 4.) Desiree Wilson was not present when the comment was made, but alleges that Smith told her about it. (D. Wilson Dep. 41-42.) Lastly, Desiree Wilson alleges that two men, on two separate occasions, entered the female bathrooms at the <u>Post</u>. (<u>Id.</u> at 54-65, 75.)

In response, the <u>Post</u> proffers that none of the Plaintiffs, nor anyone else, ever reported to Pressman Superintendent Raymond Walsh about discriminatory comments being made. (R. Walsh Aff. ¶ 87.) The <u>Post</u>'s "Equal Employment Opportunity and Unlawful Harassment Policy" has been distributed to all <u>Post</u> employees since 1996, and it provides that employees who believe they are being harassed should contact the Human Resources Department or a manager. The <u>Post</u> proffers that neither Desiree Wilson, nor any of the other Plaintiffs, ever contacted the Human Resources Department to allege harassment or discrimination. (L. Babajko Aff. ¶¶ 4-6.) With respect to male employees entering the women's restroom, Vice President of

Operations Vincent proffers that he addressed the complaint that male employees of a cleaning contractor employed by the <u>Post</u> had entered the women's restroom by promptly ordering the cleaning contractor never to use those individual employees at the <u>Post</u> again and by changing the locks on the women's restrooms to assure that only women could enter.  (Vincent Aff. ¶¶ 96-98.) With respect to the racial slur written on the locker of a black pressman, the <u>Post</u> proffers that its "incident reports" from the relevant time period contain no record of the incident (although a similar incident, involving a slur written on the locker of a Jewish employee, was recorded) (R. Walsh Reply Decl. ¶¶ 16-18), and that Desiree Wilson's omission of this allegation in her responses to Defendant's interrogatories suggests that she may have withdrawn it.  (Reply Aff. of M. Starr ¶¶ 2-3).

   II.  <u>Sherre Wilson</u>

   Plaintiff  Sherre Wilson began working at the <u>Post</u> as a Casual in 1999.  She became a member of the Union and was promoted to Junior status in July 2002.  At the time she and her co-plaintiffs commenced this lawsuit, she remained employed at the <u>Post</u>.  Sherre Wilson claims that she has been subjected to disparate treatment with regard to the terms and conditions of her employment.  Her disparate treatment claims are based on alleged discrimination in (1) shift assignments; (2) temporary position assignments; (3) task assignments; and (4) severity of discipline.  Sherre Wilson also claims that she was subjected to a hostile work environment at the <u>Post</u>.

   a.  <u>Discrimination in Shift Assignments</u>

   Upon her elevation to Junior status, Sherre Wilson was assigned to the day shift along with the two other new Juniors.  She remained on the day shift until June 2006, at which

time she requested a transfer to the night shift, which was granted.  (R. Walsh Aff. ¶ 49.)  She

alleges that white male co-workers with less "seniority" than her have been repeatedly assigned

ahead of her to work on the night shift, which she claims provides employees with "greater

opportunities to learn Journeyman skills and earn overtime pay."  (Compl. ¶ 44.)  Sherre Wilson

names five men who were allegedly wrongfully assigned to the night shift ahead of her.  (S.

Wilson Interrog. No. 3.)  Each of those men became a Junior in 2003.  Sherre Wilson's grievance

is essentially that, once initially assigned to the day shift, she remained there while lower-prior

new Juniors were assigned to the desirable night shift.

       The Post proffers that, as a matter of practice, Sherre Wilson's experience was

typical: the Post does not transfer Juniors from the day shift to the night shift, but rather fills new

spots in the night shift with newly elevated Juniors, regardless of whether there are Juniors on the

day shift with higher priority.  (R. Walsh Aff. ¶¶ 37, 42.)  The Post proffers that frequently

transferring Juniors from the day shift to the night shift would be disruptive to the efficiency of

its workplace and therefore is discouraged.  Raymond Walsh, the Pressroom Superintendent,

proffered that he only made exceptions to this rule when there were compelling circumstances

and he was satisfied that the person requesting transfer had appropriate skills for the night shift.

(R. Walsh Aff. ¶¶ 44-47.)

       Furthermore, the Post maintains that the idea that Juniors working on the day shift

should be given a chance to transfer before new, lower-ranked Juniors are assigned to the night

shift is not based on the CBA, custom or practice.  Plaintiffs have not proffered any evidence to

suggest otherwise, other than their own allegations.  The Post also alleges that, until Sherre

Wilson's request in May 2006, she had not asked Raymond Walsh, the Pressroom

Superintendent, for a transfer. (R. Walsh Aff. ¶ 49.)  When she did make such a request, it was granted.  Additionally, her sister Olivia Wilson had requested to transfer from the day shift to the night shift years earlier (in 2002), and her request was granted.  (R. Walsh Aff. ¶ 47.)

   b. <u>Discrimination in Position Assignments</u>

   Sherre Wilson maintains that she was passed over for the PIC position in favor of lower-priority white male Juniors.  Specifically, she names four pressmen who were allegedly assigned ahead of her to be PIC.  (S. Wilson Dep. at 185.)  She also names one white pressman who was allegedly assigned to be a temporary Journeyman ahead of her.  (S. Wilson Interrog. No. 4.)  She alleges that, when she began working for the <u>Post</u>, priority was respected with regard to PIC assignments and elevation to temporary Journeyman status.  (S. Wilson Aff. ¶ 5.)  It is undisputed that, in 2002 and 2003, Sherre Wilson was not designated PIC at all.  In 2004, she was designated PIC ten times and in 2005 she was designated PIC 25 times.  Sherre Wilson attributes the 2005 increase in her PIC assignments to Desiree Wilson's 2005 SDHR complaint.

   The <u>Post</u> cites the same reasons for Sherre Wilson's treatment with regard to the PIC position as it did in response to Desiree Wilson's PIC claim, asserting that: (1) foreman discretion, not priority, is used to select PICs; (2) in 2004 and 2005, Sherre was selected to be PIC more times than many higher-ranked while male employees; and (3) Sherre's increased experience, not Desiree Wilson's SDHR charge, led to more frequent PIC appointments in the later years of her employment.

   c. <u>Discrimination in Task Assignments</u>

   Sherre Wilson alleges that she was "almost exclusively" assigned to the maintenance crew rather than the roller and production crew.  (S. Wilson Aff. ¶ 3.)  Specifically,

she alleges that "[o]n or about October 10, 2003, [she] observed a white male employee who has less priority than her, placed before her for a job assignment that paid a higher wage." (Compl. ¶ 46.)  She further alleges that on October 20, 2003, Robert Smalia, a lower-ranked white Junior pressman, was placed on the roller crew, while she was assigned to the maintenance crew.  (S. Wilson Aff. ¶ 7.)  She also claims that, "[o]n or about October 13, 2005, [she] observed a white employee with less seniority than her assigned to work with the roller crew, while she was assigned to perform maintenance work."  (Compl. ¶ 45.)  She specifically identifies four lower-priority white male Juniors who were placed on the roller and production crew, while she was not.  (S. Wilson Aff. ¶ 3.)  Like her sister Desiree, Sherre Wilson alleges that, when she began working at the <u>Post</u>, the priority of a pressman was respected.  (<u>Id.</u> ¶ 5.)

   The <u>Post</u>'s explanation for Sherre Wilson's treatment with regard to the type of tasks she was assigned echoes the explanation given in response to Desiree Wilson's disparate assignment claim.  The <u>Post</u> claims that priority is not a factor in assigning pressroom work, and represents that the determination is made solely at the foreman's discretion.  The <u>Post</u> also proffers Brian Walsh's testimony that he "observed Sherre Wilson's work performance and found her to be unsuitable for the roller crew.  Sherre Wilson had poor communication skills and spoke so softly that other people working next to her could not make out what she was saying.  She also lacked leadership abilities and did not work well on a team with others."  (B. Walsh Aff. ¶ 18.)  The <u>Post</u> also proffers evidence that, during an eight month period in 2004 and 2005, Sherre Wilson was regularly assigned to the production crew.  (B. Walsh Reply Decl.¶¶ 4-5.)  Lastly, the <u>Post</u> points out that, in October 2003, Sherre Wilson submitted grievance forms in response to the appointment of a white male and a black male to the roller crew "ahead" of her,

indicating that race apparently was not a factor in the determination of which Juniors were appointed to the roller crew.  (B. Walsh Aff. ¶ 19.)  Sherre Wilson claims that assigning certain black employees to desired positions is a cover-up.  (S. Wilson Dep. at 213.)

        d.     <u>Discrimination in Severity of Discipline</u>

Sherre Wilson also claims that the <u>Post</u> discriminated against her by disciplining her more severely than white male employees.  On March 16, 2003, Sherre Wilson received a verbal warning for taking too long to clean a unit.  (S. Wilson Dep. at 286.)  As Sherre Wilson describes the incident, Brian Walsh "ordered" her to the middle of the floor and verbally reprimanded her in front of one co-worker who was standing right next to her and others who were dispersed throughout the room.  (<u>Id.</u> at 286-88.)  She also notes that her Union representative was not present and did not sign off on the infraction.  (<u>Id.</u> at 289.)  Additionally, Sherre Wilson claims that the reprimand was unwarranted because she was forced to do her and her partner's job after her partner was unexpectedly reassigned.  (<u>Id.</u> at 291-292.)  She cites this as evidence that two of the foremen were conspiring against her, because she never saw white employees being required to do their partners' jobs.  (<u>Id.</u>)

Sherre Wilson further claims that a verbal warning she received on May 21, 2003, for not being at her station was discriminatory.  She claims that she was told to be working on something else at the time and could not be expected to be two places at once.  (<u>Id.</u> at 272, 280.)  She does not allege that these verbal reprimands resulted in any consequences such as suspension from work, reduced earning capacity, or denial of a promotion opportunity.  In response to these allegations, the <u>Post</u> proffers that the verbal reprimands were consistent with those given to all

employees for such infractions, and it identifies two white males who received the more severe

discipline of a written warning for not being at their stations in 2004.  (B. Walsh Aff. ¶¶ 47-48.)

       e.    <u>Hostile Work Environment</u>

       Sherre Wilson alleges that she was subjected to a hostile work environment while

working at the <u>Post</u>.  She claims that Brian Walsh "harassed [her] on a daily basis with threats of

disciplinary action."  (S. Wilson Aff. ¶ 11.)  She states that, on October 27, 2004, Brian Walsh

"approached [her] and threatened to have [her] fired."  (<u>Id.</u>)  Sherre Wilson alleges that, after the

October 2004 interaction with Brian Walsh, she had a "nervous breakdown" and was taken to a

hospital.  She asserts that this reaction "was a result of the constant pressure and intimidation

Brian Walsh had been subjecting [her] to on a daily basis," and alleges this treatment was

"racially motivated because Mr. Walsh always sought opportunities to humiliate black

employees."  (<u>Id.</u>)

       Sherre Wilson alleges that, "<u>Post</u> foremen told <u>Post</u> security personnel not to

speak to or associate with [her], because she is likely to file a sexual harassment charge against

them."  She alleges that a white male co-worker asked her to come to his house and clean his

windows.  (S. Wilson Aff. ¶ 11; Pls.' Ex. 25.)  She alleges that, on September 3, 2003, she "was

belittled when [she] was informed that [she had] an able body to perform a task outside [her] job

description."  (Pls.' Ex. 25.)  Lastly, Sherre Wilson alleges that Nytricia Smith, a black press-

worker, had an object kicked or slapped out of her hand by foreman Sanderson.  (Sherre Wilson

Dep. at 340.)  After the incident, Sherre Wilson claims, Smith was either suspended or fired,

while Sanderson was not disciplined.  (<u>Id.</u>)  Sherre Wilson was not present for the alleged

incident but asserts knowledge of it based upon comments she heard from co-workers.  (Id. at 340-41.)

III.    Olivia Wilson

Plaintiff Olivia Wilson began working at the Post as a Casual in 1999 and became a Junior press-worker in July 2002.  Upon her elevation to Junior status, Olivia Wilson was assigned to the day shift.  However, due to pregnancy concerns, she requested, and was granted, a transfer to the night shift in the Fall of 2002.  From January to October 2003, Olivia Wilson took a leave of absence.  She stopped working at the Post in March 2005 and has been on a leave of absence since that time.

Olivia Wilson alleges that she was subjected to disparate treatment with regard to the terms and conditions of her employment.  Her disparate treatment claims are based on alleged discrimination in (1) temporary position assignments; (2) task assignments; and (3) severity of discipline.  Olivia Wilson also claims that she was subjected to a hostile work environment at the Post.

a.    Discrimination in Temporary Position Assignments

Olivia Wilson alleges that the Post discriminated against her by designating lower-ranked Juniors ahead of her to the PIC position.  (Compl. ¶ 54.)  Olivia Wilson was not designated PIC in 2002 and 2003.[7]  In 2004, she alleges, she worked no shifts as PIC (O. Wilson Dep. at 154), while the Post proffers that she worked one shift.  (Def.'s Ex. OO.)  Olivia Wilson specifically names one lower-ranked Junior who, in 2001 or 2002, was made PIC two or three

_____

[7]    As noted above, Olivia Wilson was on leave for approximately ten months in 2003.

times ahead of her.  (O. Wilson Dep. at 153, 157.)  When asked to identify the instances in which

she was passed over for the PIC position, Olivia Wilson was unable to recall any of the dates.

(Def.'s Ex. WW; O. Wilson Supp. Interrog. No. 1.)

   In addition to its general defense that PIC assignments are made based upon

foreman discretion rather than Junior priority, the <u>Post</u> claims that Olivia Wilson did not have

either the necessary experience or ability to be appointed PIC.  The <u>Post</u> proffers, through the

affidavit of Pressroom Superintendent Raymond Walsh, that since Olivia Wilson only became a

Junior in July 2002 and was transferred to the night shift in October or November of 2002, she

did not have enough experience on the night shift to be made PIC in 2002.  (R. Walsh Aff. ¶ 63.)

The <u>Post</u> further claims that, since Olivia was out on leave for the majority of 2003, "she did not

have an opportunity to obtain the skills necessary to be PIC."  (<u>Id.</u>)  Raymond Walsh alleges that

he gave Olivia Wilson an opportunity to be PIC in 2004, but he "determined that Olivia did not

have the experience, mechanical ability or leadership capabilities to perform the task."  (<u>Id.</u>)  The

<u>Post</u> also proffers that its decision not to appoint Olivia Wilson to be PIC was not discriminatory,

as evidenced by the appointments of other females and minorities to the position.  (<u>Id.</u> ¶ 65.)

   b. <u>Discrimination in Task Assignments</u>

   Olivia Wilson alleges that, while she was on the day shift, she was generally

assigned to the maintenance crew.  (Olivia Wilson Aff. ¶ 3.)  Therefore, Olivia claims, she was

not afforded an opportunity to learn the "skills of the trade."  (<u>Id.</u>)  She alleges that she was never

placed on the roller crew, while Junior pressmen with lower priority were assigned to the both

the roller and production crew.  (<u>Id.</u>)  She specifically names two white Juniors whom she alleges

were assigned to those tasks.  (<u>Id.</u>; O. Wilson Dep. at 187.)  She further alleges that, while

working as a Junior on the maintenance crew, she was relegated to "get[ting] the bucket, soap and water," and cleaning (O. Wilson Aff. ¶ 3), and that she was often given more "onerous" assignments than the white pressmen working on the crew.  (Id. ¶ 4.)  However, the last time Olivia Wilson was placed on the maintenance crew was in 2002.  (O. Wilson Dep. at 107.)

       c.      <u>Discrimination in Severity of Discipline</u>

Olivia Wilson alleges that the <u>Post</u> sanctioned her improperly and more harshly than white employees.  (Compl. ¶ 53.)  Olivia Wilson was given a two week suspension on January 14, 2005, for purportedly committing a "no-call/no-show" (<u>i.e.</u>, not providing sufficient notice to the <u>Post</u> that she would be absent from a scheduled shift).  Olivia Wilson's first objection to the punishment is that she believes that she did not commit a "no-call/no-show." She alleges that she timely called in on a Wednesday night, and told the clerk who answered the phone that she would be out for both of her scheduled shifts on Thursday and Friday.  Olivia Wilson identifies four white male employees who allegedly received more lenient treatment and four black employees who each received the more stringent two-week suspensions for their "no-call/no-shows" (and, in one case, a "call-in"[8]).  Lastly, Olivia Wilson testified that she was not made aware of any changes in the <u>Post</u>'s office rules with regard to "call-ins."  (O. Wilson Dep. at 328; Pls.' 56.1 Stmt. ¶ 4.)

In response to Olivia Wilson's claim of discriminatory discipline, the <u>Post</u> alleges that a two week suspension was the sanction mandated by the Office Rules for a "no-call/no-

---

[8]     A <u>Post</u> pressroom employee who notifies the foreman at least two hours in advance that he will be absent from a scheduled shift commits a "call-in."  A <u>Post</u> pressroom employee who only notifies the foreman within two hours of the start of his shift, or fails to notify the foreman at all, commits a "no-call/no-show" if he is absent from his shift.  See <u>Post</u>'s Office Rules, Ex. G; O. Wilson Dep. at 285.

show" during the relevant time period.  (Vincent Aff. ¶¶ 57, 84; Def.'s Ex. H.)  The <u>Post</u> also alleges that those same rules mandated lesser sanctions for "call-ins."  (<u>Id.</u>)  According to the <u>Post</u>, Office Rules become effective immediately after the Union is informed of them and the rules are posted in the pressroom, and it is the Union's obligation to make pressmen aware of the rules.  (Vincent Aff. ¶ 47.)  Additionally, the <u>Post</u> states that none of the white men that Olivia mentions as having received more lenient punishment were similarly situated to Olivia Wilson.  The <u>Post</u> alleges that each of them either committed the same violation at a different time (when the Office Rules mandated a different sanction) or committed a different violation (a "call-in" rather than a "no-call/no-show"), and Olivia Wilson concedes the latter point.  (R. Wilson Aff. ¶¶ 82-83, O. Wilson Dep. 285.)  As for the black employees who purportedly received more stringent punishments, the <u>Post</u> claims that one of those punishments was the result of a clerical error, and that the others received the mandated punishments.  (Def's Ex. JJJ.)  The <u>Post</u> also identifies numerous white male pressmen who received two week suspensions for no-calls, just as Olivia Wilson did.  (Def.'s Mem. 32.)

In addition, the <u>Post</u> proffers that an investigation into whether Olivia Wilson called off for two days, as she claims, or just one day, as the clerk with whom she spoke insisted, was investigated and resolved against Olivia Wilson.  (Vincent Aff. ¶¶ 84-85.)  Finally, Joseph Vincent, the Senior Vice- President of Operations, states that at no point prior to the beginning of the current action did either the Union or Olivia Wilson claim that her suspension was somehow related to her race or gender.  (Vincent Aff. ¶ 88.)

        d.       <u>Hostile Work Environment</u>

Olivia Wilson's hostile work environment complaint is premised upon her interactions with Gary Sanderson, the night foreman, and the alleged presence of inappropriate photos at the workplace.  Olivia Wilson alleges that, from the time she began working at the Post, Sanderson would "yell and scream" at her.  (O. Wilson Dep. at 64-65.)  On one specific occasion, Olivia alleges Sanderson yelled at her and asked her where she was going and what she was doing "in a very loud tone" while there where other people present.  (Id. at 65.)  After Olivia Wilson responded, Sanderson allegedly said, "I'm talking to you. Don't you walk away from me when I'm talking to you." (Id.)

On a separate occasion, while the two of them were working on a press together, Sanderson told Olivia Wilson, "Hurry up and send the goddamn sheets down. I don't have time for shit."  (Id. at 68.)  Olivia states that she complained about Sanderson's behavior to Raymond Walsh and presented the possibility that Sanderson's action might be motivated by race or gender.  (Id. at 69; O. Wilson Aff. ¶ 11.)  She attributes Sanderson's actions to racism because he "is known to abuse other blacks such as Jerome Watson and Nytricia Smith."  (O. Wilson Aff. ¶ 10.)  Olivia further asserts that, "I have never observed him talking to white pressroom employees the same way he speaks to blacks.  His conduct often made me nervous and anxious, making it difficult for me to concentrate on my work."  (Id.)

Additionally, Olivia Watson claims that she was "exposed on a daily basis to photographs of scantily clad women posted by the male pressmen [throughout the pressroom]." (Id. ¶ 12.)

IV.     Jerome Watson

In June 2002, Plaintiff Jerome Watson ("Watson") transferred to the <u>Post</u> from another New York newspaper.  Upon his transfer, Watson was assigned to the night shift.  He was employed as a permanent press-worker at the <u>Post</u> until June 2003, when he was fired.  He was subsequently reinstated and worked as a permanent press-worker again from September 2003 to June 2004, when he was fired a second time.  Watson alleges that he was subject to disparate treatment and a hostile work environment on account of his race.

        a.      <u>Incident between Sanderson and Watson on May 28, 2003</u>

Watson claims on May 28, 2003, while he was leaning over a number of buckets on the pressroom floor, Sanderson "ran up and kicked one of the buckets out of [his] hand," causing an injury to his finger.  (Watson Aff. ¶ 8.)  According to Watson, Sanderson then got very close to his face and further spoke to him in harsh and vehement tones.  (Watson Dep. at 113.)  Watson does not remember what was said during the altercation, except that Sanderson used curse words.  (<u>Id.</u> at 117.)

Immediately after the altercation, Watson filled out an employee incident report.  (Def.'s Ex. L.)  The report does not mention any use of racial epithets, or make any other reference to the incident being racially-motivated.  (<u>Id.</u>)  However, in the current lawsuit, Watson attributes Sanderson's alleged actions on May 28, 2003, to racism because, from the beginning of Watson's employment, Sanderson allegedly acted in a way to purposely make Watson angry.  (Watson Dep. at 199.)  Those actions allegedly included making Watson "clean up stuff," and giving him odd jobs.  (<u>Id.</u>)  Watson testified that he could tell that Sanderson's behavior was based on race, "[f]rom the way he talks to me, the way he looks at me, he smirks at me.  He does things that you don't have to say things to show that you don't like someone or you dislike

them." (Id.)  Watson admits that Sanderson never made any racist comments to him.  (Id. at 201.)

Sanderson was not disciplined for the May 28, 2003, incident. (Vincent Aff. ¶ 67.) Vincent, the Vice-President of Operations, states that Sanderson was not disciplined because, after a thorough investigation, Vincent "genuinely believed" that the charge was "bogus" and had no reason to think that the incident was racially-motivated.  (Vincent Aff. ¶¶ 66- 68.)  However, Watson views Sanderson's lack of punishment as evidence of the Post's racism.  (Watson Aff. ¶¶ 201-02.)

b.    Watson's June 6, 2003 Termination

On June 6, 2003, the Post terminated Watson's employment.  (Def.'s Ex. B.)  The Post explained to Watson, in a Notice of Termination dated that same day, that the reason for his termination was that he had three or more unexcused absences, the first two of which had drawn a warning and a suspension.  (Def.'s Ex. O; R. Walsh Aff. ¶ 73.)  The Office Rules in effect during the relevant time period provided that three unexcused absences per month in three months of a year would result in termination.  (Def.'s Ex. XX.)

On June 20, 2003, Watson filed a criminal complaint against Sanderson.  (Def.'s Ex. N.)  He subsequently obtained a protection order against Sanderson.  (Vincent Aff. ¶ 67.) Watson claims that, while he was out of work, the Post sent "camera men to secretly film [his] activities at home."  (Watson Aff. ¶ 9.)

After a series of negotiations between Watson, the Post and the Union, Watson was reinstated on the day shift in September 2003.  Watson asserts that his reinstatement to the day shift, rather than the desired night shift he previously worked, constituted discriminatory

treatment.  The <u>Post</u> claims that it could not place Watson back on the night shift because he had

(and was unwilling to give up) a protection order against Sanderson, the night foreman.  (Vincent

Aff. ¶ 74.)  The <u>Post</u> proffers that it offered Watson the chance to go back to the night shift if he

would to drop the protection order.  (<u>Id.</u> ¶ 76.)  According to the <u>Post</u>, Watson never signed the

agreement, although he orally agreed to it in person at a meeting with Vincent.  (Vincent Aff.  ¶¶

76-77.)

        Watson alleges that, in the course of negotiations, he was willing to drop the

protection order to be reinstated to the night shift.  (Watson Dep. at 205-06.)  He alleges that he

told his Union-appointed lawyer that he would be willing to drop the protection order because he

did not want to work on the day shift, but the lawyer advised him that the <u>Post</u> was no longer

interested in the protection order and did not want Watson to work on the night shift.  (<u>Id.</u>)

Watson did not discuss his reinstatement on the day shift with <u>Post</u> personnel.  (<u>Id.</u> at 206-07.)

        c.      <u>Watson's Working Conditions</u>

        Watson claims that the <u>Post</u> discriminated against him by denying him the

opportunity to work on the production and the roller crew, and by relegating him to cleaning and

oiling press units while lower-priority white pressmen were assigned to work on the production

and the roller crew.  (Watson Dep. at 284-85).  He alleges that he was "consistently assigned the

most menial and onerous job duties," which paid lower wages.  (Compl. ¶¶ 60, 66.)

        Watson also claims that his two-week suspension on May 14, 2004 for a "no-call"

and his termination on June 25, 2004 for a second "no-call" after the May 11, 2004 rule change

about "no-calls" were discriminatory.  Watson alleges that white Juniors received more lenient

sanctions and cites three white employees who purportedly received more lenient sanctions.  The

Post points out that two of these white employees committed "call-ins," a different violation that mandated a lesser punishment than a "no-call," as discussed *supra*.[9]   According to the Post, even though the third man committed a "no-call" like Watson, he did so at a different time period, when the rules mandated a different punishment.  However, that third man was terminated when he committed a "no-call" after the new rules were in place.  Additionally, the Post points out that Watson's May 2004 and June 2004 sanctions were in line with changes to the Office Rules that took effect on May 12, 2004, and established more stringent punishments for absences from work.  Lastly, the Post provides the names of two white pressmen who were also terminated for committing a second no-call after the May 2004 rules change.  (R. Walsh Aff. ¶¶ 81-84.)

Apart from the aforementioned incidents Watson alleges that, after his reinstatement on the day shift, he was humiliated by being prevented from having a drink of water from a fountain and being required to ask permission before he used the restroom. (Watson Aff. ¶ 5.)  Watson asserts that this constitutes disparate treatment because, although he admits that there is a rule requiring pressmen to receive permission before leaving their workstation, allegedly "[w]hite pressmen did not have to ask Brian Walsh for permission to go to the bathroom and I never saw him prevent any of them from drinking water in the pressroom." (Watson Dep. at 303; Watson Aff. ¶ 7.)  Watson also claims that, while he was working the night shift, Sanderson "often ranted and screamed" at him without provocation.  (Watson Aff. ¶ 8.)

---

[9]   According to Pressroom Superintendent Raymond Walsh, Watson's infraction would have been referred to as a "call-in" under the subsequently enacted May 11, 2004, version of the Office Rules, yet at the time of the March 12, 2004, suspension, all absence incidents in which pressmen did not call the Post at least two hours before their shift commenced were referred to as "no-calls."  (R. Walsh Aff. ¶ 75.)

<u>DISCUSSION</u>

Summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of establishing the absence of any genuine issue of material fact.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  For the purposes of summary judgment, a fact is material "if it 'might affect the outcome of the suit under the governing law.'"  <u>Holtz v. Rockefeller & Co.</u>, 258 F. 3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Id.</u>

In opposing a motion for summary judgment, the nonmoving party may not rest on mere allegations of contested facts, but must "set out specific facts showing a genuine issue for trial."  Fed R. Civ. P. 56(e)(2).  "Conclusory allegations, conjecture and speculation" do not establish a genuine issue of fact, and thus will not provide a sufficient basis for a nonmoving party to resist summary judgment.  <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998).  The facts will be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences shall be drawn on the nonmovant's behalf.  <u>American Cas. Co. v. Nordic Leasing, Inc.</u>, 42 F.3d 725, 728 (2d Cir. 1994).  A court must be "especially cautious" in an employment discrimination case, when "the employer's intent is at issue."  <u>Kerzer</u>, 156  F.3d at 400 (citing <u>Gallo v. Prudential Residential Servs. Ltd. P'ship.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

The Plaintiffs claim that they were denied preferred shift assignments, preferred temporary position assignments, and preferred task assignments and have been punished more severely because they are black and, in three out of four cases, female.[10]  Such disparate treatment claims under § 1981, Title VII and the New York State Human Rights Law are evaluated under the three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[11]

Under a McDonnell Douglas Corp. analysis, a plaintiff must establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position held; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the action gave rise to an inference of discrimination.[12]  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  The "adverse employment action" must be "more disruptive than a mere inconvenience or an alteration of job responsibilities.  Instead, a materially adverse change must be of the order of a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or the like."  Shapiro v. New York Dep't of

---

[10]   There is no clear indication as to which of Plaintiffs' claims are based on gender and which are based on race (or which are based on both).

[11]   Plaintiffs' employment discrimination claims under the New York State Human Rights Law are subject to the same standard of proof as claims under Title VII. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Borrero v. American Express Bank, Ltd., No. 05 Civ. 10801, 2008 WL 3133602, *10 (S.D.N.Y. Feb. 5, 2008). The same is true for claims under § 1981. See Whidbee v. Garzarelli Food Specialties, Inc., 233 F.3d 62, 69.  Plaintiffs' claims under the New York City Human Rights Law are treated separately *infra*.

[12]   Plaintiffs are all members of one or more protected classes.  Accordingly, the first element of the *prima facie* case is satisfied with respect to each of the instant claims and need not be analyzed further.

Educ., 561 F. Supp. 2d 413, 422 (S.D.N.Y. 2008) (citing Curran v. All Waste Systems, Inc., 213 F.3d 625 (2d Cir. 2000)).  The plaintiff's burden at the *prima facie* case stage is minimal. Cooper v. State of Conn. Pub. Defenders Office, 208 Fed. Appx. 24 (2d Cir. 2008).

Once the plaintiff's *prima facie* case is established, the burden shifts to the employer to offer some legitimate, nondiscriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  "This burden is one of production, not persuasion; it can involve no credibility assessment."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal citation and quotation marks omitted).  At this stage, the employer does not need to prove that the challenged action was not the product of discrimination, but must provide a clear and specific explanation for the action.  Gibbs v. Consol. Edison Co. of N.Y., 714 F. Supp. 85, 89 (S.D.N.Y. 1989).  The presumption of discrimination arising from the *prima facie* case drops out upon such a proffer of a legitimate, nondiscriminatory reason.  The plaintiff then has the burden of offering proof that would enable a reasonable fact finder to conclude that the proffered reason was a pretext for prohibited discrimination.  Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000); Reeves, 530 U.S. at 143.  A plaintiff may rely at the rebuttal stage on the same facts used to establish the *prima facie* case so long as a preponderance of the evidence would allow a reasonable fact finder to find that a discriminatory violation has occurred.  Holtz, 258 F.3d at 78. However, a plaintiff's own conclusory allegations will not be sufficient to overcome proffered evidence substantiating the defendant's non-discriminatory rationale for its actions.  See Jasmin v. Dep't of Labor, No. 04 Civ. 10237, 2007 WL 1746909, at *8 (S.D.N.Y. Jun. 15, 2007).

I.      Desiree Wilson's Disparate Treatment Claims

Desiree Wilson first alleges that her "reassignment" to the day shift was discriminatory.[13]   She has proffered that working on the night shift provides pressmen with more opportunities for production work, skill development, and overtime pay (D. Wilson Aff. ¶ 6), and thus being denied an opportunity to work on the night shift is sufficient to establish the element of a *prime facie* case that she suffered an adverse employment action.  Her basis for an inference of discrimination is limited to her allegation that she was originally assigned to the night shift but then was "reassigned" to the day shift.  However, since the plaintiff's burden at the *prima facie* case stage is a minimal one, the Court will assume without deciding that Desiree Wilson's proffers with regard to her day shift assignment are sufficient.

The burden thus shifts to the Post to provide a nondiscriminatory, legitimate reason for assigning Desiree Wilson to the day shift.  The Post more than meets this requirement by proffering the testimony of Superintendent of the Pressroom Raymond Walsh, who explains that new Juniors are assigned to the day shift or night shift based on their rank on the Junior Priority List, which is based on the order of the Casual List.  Juniors with higher priority are assigned to the night shift on an "as-needed" basis and the remaining lower-ranked Juniors are assigned to the day shift.  Raymond Walsh's undisputed proffer is substantiated by a chart prepared by Pressroom Foreman William Bogan that demonstrates that this was consistently done from at least 2001 until 2005.  (R. Walsh Aff. ¶¶ 31-33, W. Bogan Aff. ¶ 23, Def.'s Ex. MM.)  When Desiree Wilson was promoted to Junior status, the evidence shows that she was the lowest-ranked Junior in the pressroom. (Def.'s Ex. MM).  Furthermore, when Desiree Wilson

---

[13]      The Post alleges that, upon promotion to permanent status, Desiree Wilson was assigned to the day shift, and that she had previously only worked the night shift as a Casual.  (R. Walsh Aff. ¶ 33.)

was assigned to the day shift, the three other employees assigned to the day shift were white males, whereas the one black male and white female in the group were both assigned to the night shift.  (Id.)

Desiree Wilson has not proffered any evidence to suggest that the reasons advanced by the Post for the day shift assignment should be rejected as pretexts for race or sex discrimination.  Because no rational fact finder could infer from the undisputed record that Desiree Wilson's assignment to the day shift was discriminatory, the Post is entitled to summary judgment as a matter of law in its favor on this claim.

Desiree Wilson asserts that the Post discriminated against her because a foreman once made her do the task of a Junior (picking up rags) while she was assigned to the Journeyman position.  This allegation is devoid of any proffer that her Journeyman status (which entitled an employee to a higher pay rate) was actually taken away from her in that incident.  As such, there is no evidence that the alleged incident entailed a diminution in pay, demotion in job title, or any other consequence sufficient to constitute an "adverse employment action." Accordingly, this allegation is insufficient to state a *prima facie* case.

Desiree Wilson also asserts that the Post discriminated against her by passing her over for PIC assignments.  She has shown that she was never selected to be PIC in 2002 and 2003 and that she was selected nine times in 2004.  During those years, a number of lower-priority white male Juniors were picked to be PIC.  Because the Plaintiff's burden at the *prima facie* stage is minimal, the Court will assume without deciding that Desiree Wilson has satisfied her burden and established a *prima facie* case with regard to being passed over for the PIC position between 2002 and 2004.

The burden thus shifts to the Post to provide a nondiscriminatory, legitimate reason for Desiree Wilson being allegedly passed over for her infrequent selection for the PIC position between 2002 and 2004.  The Post has proffered specific evidence showing that PIC selection decisions are governed solely by the foreman's discretion and are not determined based upon the rank on the Junior Priority list of the eligible employees.  (B. Wilson Aff. ¶ 32; Def.'s Ex. A).  The Collective Bargaining Agreement is replete with provisions supporting the Post's position in this regard.  (Def.'s Ex. A.)  The Post has proffered uncontroverted evidence that the PIC is one of the most important positions in the pressroom, and that it is logically necessary that foremen select Juniors who have a certain level of experience to be PIC.  (R. Walsh Aff. ¶¶ 56-57.)  Furthermore, Plaintiffs have not proffered any evidence demonstrating generally that the foremen's exercise of their discretion in this regard has had a discriminatory impact, whereas Defendant has proffered uncontroverted evidence to the contrary.  (Def.'s Ex. OO; W. Bogan Aff.)

Desiree Wilson has failed to shoulder her burden of proof that would enable a reasonable fact finder to conclude that the proffered reason was a pretext for prohibited discrimination.  She alleges that the Post only increased her PIC assignments in 2005 because she initiated a SDHR lawsuit that year, but this allegation does not call into question the Post's proffered explanation that Desiree Wilson was not selected to be PIC more often in the years 2002 through 2004 because the foremen determined that other eligible employees were better suited to perform the critical task.  The Post has proffered evidence that demonstrates that the CBA permitted such assignments to be made according to the foreman's discretion, and "[a] court must give considerable deference to an employer's judgment regarding what functions are

essential for service in a particular position." D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998). The Post has also proffered evidence that in this time period other black and female employees were selected to be PIC while some white male pressmen were never selected to be PIC, further substantiating the Post's assertion that determinations of merit, rather than considerations of race or gender, guided the foremen's exercise of discretion.[14] (B. Walsh Aff. ¶¶ 30-32.)

Plaintiffs cite Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972), for the proposition that "employment practices which rely upon the subjective decision-making of white foremen in organizations with a history of discriminating against blacks provide a ready mechanism for discrimination." (Pls.' Opp. at 18.) In Rowe, the Fifth Circuit Court of Appeals held that defendant General Motors' practice of requiring all hourly workers to receive the blessing of their white foreman before being considered for a salaried position constituted unlawful employment discrimination. The district court's contrary determination, reversed on appeal, rested largely on its finding that General Motors lacked discriminatory intent, yet the Court of Appeals emphasized that a proper analysis under Title VII measures disparate treatment by results, not intentions. Rowe, 457 F.2d at 356-59. The Court of Appeals measured the disparate impact of General Motors' hiring practices with quantitative evidence proffered by the parties revealing, for example, that "of a total of 114 employees promoted from hourly jobs to salaried jobs between 1963 and 1967, only 7 were blacks." Id. at 357. In the instant case, in contrast, Plaintiffs have failed to produce any quantitative evidence to frame a genuine issue of

---

[14]     The Court also notes that a white male pressman, Alex Myers, was never assigned to the roller crew or to be PIC despite having the highest priority of any Junior Pressman. (R. Walsh Aff. ¶ 51.)

material fact as to the disparate impact of the Post's practices.  Rather, the barren record in that

respect demonstrates Plaintiffs' failure to meet their burden on this claim.

   Plaintiffs also cite United States v. Bethlehem Steel Corporation, 446 F.2d 652

(2d Cir. 1971), for the proposition that "a system that perpetuates past discriminatory practices in

job assignments violates Title VII."  (Pls.' Opp. at 18.)  Bethlehem Steel, however, is readily

distinguished from the instant case as well.   In Bethlehem Steel, a civil enforcement action

brought by the federal government, the defendant admitted in two extensive stipulations that:

> In hiring, jobs were made available to whites rather than to blacks in
> a number of ways. There were no fixed or reasonably objective
> standards and procedures for hiring; the aptitude test scores of some
> white applicants were fraudulently raised; some white applicants
> were hired without testing; and whites were given preference in
> summer employment.  Job assignment practices were even more
> reprehensible.  Over 80 per cent of black workers were placed in 11
> departments, which contained the hotter and dirtier jobs in the plant.
> Blacks were excluded from higher paying and cleaner jobs.  All of
> the defendants were aware of this racial discrimination.  Even within
> a department, the pattern continued.  In the Coke Ovens Department
> the blacks were assigned for the most part to the two poorest paid
> and least desirable of the four seniority units.  Similar preferential
> treatment was given to whites in the choosing of apprentices and in
> the selection of supervisors.

Bethlehem Steel, 446 F.2d at 655.  In light of that history of discrimination, which only ended

with the commencement of the Government investigation, the Court held impermissible under

Title VII a seniority-based transfer system that forced black workers to choose between the devil

of remaining in their current positions (which were the most undesirable in the Plant and to

which they had been assigned under past discriminatory practices) or the deep blue sea of

transferring (which entailed sacrificing all of the seniority benefits they had accrued).  Id.   The

Court accordingly ordered that the defendant permit minority employees to retain their pay and seniority benefits when transferring departments.  Id. at 664.

In the instant case, in which the Post has implemented a system of allocating position assignments based on the foreman's merit-based discretion, Plaintiffs have proffered no evidence of the perpetuation of any previously entrenched discriminatory structure.  Rather, many of the minority and female pressmen that the Post have brought into its workforce have been assigned to be PIC, often ahead of white males.  Accordingly, Plaintiffs have not demonstrated that the employment practices at issue here, like those in Bethlehem Steel, perpetuate past discriminatory practices.

In sum, Desiree Wilson has not met her burden of raising a genuine issue of material fact as to whether the Post's proffered non-discriminatory rationale for the manner in which it makes PIC selections is a pretext, and there is no genuine issue of material fact as to whether Desiree Wilson's PIC assignments (or lack thereof) were the product of unlawful employment discrimination.  Defendant is entitled to summary judgment as a matter of law with regard to this claim.

Desiree Wilson also asserts a disparate treatment claim on the grounds that she was usually assigned to the maintenance crew rather than to production or the roller crew (collectively, "task assignments").  Desiree Wilson has met her *prima facie* burden with respect to this claim.  She alleges that assignments to the roller crew or to production allow pressmen to develop the skills necessary to become Journeymen, and thus without such assignments she

cannot become eligible for the higher pay that Journeymen enjoy.[15]  She alleges that the task

assignment patterns raise an inference of discrimination because white pressmen who had lower

priority than her were assigned to preferred tasks, whereas, until about the time black pressman

began working in the Post, certain white male employees were allowed to bid on positions for the

roller crew in accordance with their priority rank.

> The Post has proffered non-discriminatory reasons in response to Desiree

Wilson's *prima facie* case.  As with Desiree Wilson's PIC disparate treatment claim, the Post

asserts that the CBA empowers the foreman to appoint all Juniors to job tasks based solely on

their discretion and not on priority.  The Post proffers that Desiree Wilson was placed on the

roller crew on a number of occasions, but that the dayside foreman concluded "she lacked the

mechanical ability for the task, was unwilling to take direction and could not perform well as a

team with other members of the roller crew."  (B. Walsh Aff. ¶ 20).  For the reasons stated above

with respect to Desiree Wilson's PIC disparate treatment claim, the Court concludes that this

proffer satisfies the Post's burden of production.

> Desiree Wilson seeks to frame a genuine issue of material fact as to whether the

Post's asserted reason is a pretext to mask a discriminatory practice by alleging that the Post only

switched away from a priority-based task assignment system to a merit-based discretionary task

assignment system around the time in which black pressman might have benefitted from a

---

[15]     Desiree Wilson and her fellow plaintiffs argue that the Post was obligated to
assign them tasks that would teach them Journeyman skills in part because of
legal obligations that attach to apprentice programs registered with the United
States Department of Labor.  (Pls.' Opp. 12.)  Plaintiffs have not proffered any
evidence demonstrating that the Post operates such a program, let alone that such
a program applies to them.

priority-based system.  Joseph Vincent, the Post's Senior Vice-President of Operations, has proffered that he ordered the switch in May 2002, immediately upon his discovery that a seniority based system had developed, because it is the Post's policy that merit-based discretion assures the best quality production.  The Post has also proffered that, since May 2002, black pressmen have been assigned to the roller crew while at the same time many white male pressmen have not, demonstrating that there has not been a disparate impact.  (B. Walsh Aff. ¶¶ 21-23.)  Desiree Wilson has not proffered any evidence to contradict these proffers and support her allegation that Vincent's proffered rationale is merely a pretext.[16]  Therefore, under McDonnell Douglas, the Post must be granted summary judgment as a matter of law with respect to this claim.

Desiree Wilson's final allegation is that the Post imposed discriminatory discipline upon her.  This claim is premised upon a three day suspension administered in 2003 for "sharpshooting" and two suspensions administered in 2004 for "carelessness" and "neglect of duty."  Her allegation that the "sharpshooting" sanction was improper is supported solely by her unsubstantiated allegation that a "lot of [pressroom employees] work on their vacation," and thus the Post's determination that her work on a vacation day constituted "sharpshooting" must have been discriminatory.  With respect to the 2004 suspensions, Desiree Wilson identifies seven white male employees who allegedly committed the same infractions but only received verbal and written warnings, and she alleges that the subsequent reduction of her suspensions signifies that the original sanctions were incorrect.  Because the *prima facie* standard is minimal, the Court assumes that Desiree Wilson has met it.

---

[16]     Plaintiffs have also not proffered any evidence demonstrating that they would have had sufficiently high priority to benefit from the seniority-based system that Vincent abolished.

With regards to the "sharpshooting" punishment, the Post proffers the testimony of Brian Walsh, the Supervisor who imposed the sanction, stating both that he never interpreted the sharpshooting rule to treat vacation days differently than off days (nor did he know of any other foreman who interpreted the rule that way when enforcing it) and that, in any event, he acted on a good faith belief that Desiree Wilson's actions constituted sharpshooting when he imposed the suspension.  (B. Walsh Aff. ¶¶ 34-37.)  Brian Walsh's affidavit also evidences that Desiree Wilson was suspended in 2004 only after she had been given multiple warnings about her work ethic, including a written warning clearly indicating that it was a "final" warning before the Post would suspend her for continued infractions.  (B. Walsh Aff. ¶¶ 39-42.)  The Post has proffered documentary evidence supporting its allegations, in the form of an "Infraction Report" detailing the behavior in question and letters provided to Desiree Wilson regarding her work performance.  (Def.'s Exs. CC, FF.)

The Post has also proffered documentary evidence demonstrating that three of the six white male pressmen who allegedly received more lenient discipline than Desiree Wilson received actually were suspended (and, in some cases, terminated), and that other white male pressman received similar punishments to those imposed on Desiree Wilson.  (R. Walsh Reply Decl. ¶¶ 19-25, Def.'s Exs. ZZ-GGG.)  Finally, the Post proffers evidence of other female and minority pressmen who received the same non-suspension warnings for infractions of the type that Desiree Wilson alleges reflect favoritism to white male pressmen.  (R. Walsh Reply Decl. ¶ 26, Def.'s Exs. HHH-III.)

The Post has met its burden of production by proffering a nondiscriminatory, legitimate reason for its actions with regard to its discipline of Desiree Wilson, and Desiree

Wilson has not proffered any evidence to demonstrate that these proffers are a pretext to mask discriminatory intent. Accordingly, no reasonable fact finder could conclude that Desiree Wilson has met her burden of proof with respect to her claim that she has been subjected to disparate disciplinary punishments.

In sum, the evidence on record, viewed in the light most favorable to Desiree Wilson, cannot support a rational fact finder's determination that Desiree Wilson has carried her burden of framing a genuine issue of material fact as to whether she was subjected to race or gender-based disparate treatment. Accordingly, the Post is entitled to judgment in its favor as a matter of law on all of Desiree Wilson's disparate treatment claims.

II.    Sherre Wilson's Disparate Treatment Claims

Sherre Wilson alleges that white male pressmen with lower priority have been repeatedly assigned ahead of her to work the night shift, and she identifies five such white male pressmen to support her claim. Given the minimal showing required to establish a *prima facie* case, the Court assumes that this is sufficient to raise an inference of discrimination. As stated above, being denied an opportunity to work on the night shift constitutes an adverse employment action. Sherre Wilson was transferred to the night shift in May 2006, and therefore there is no dispute as to her ability to work the night shift. Accordingly, the Post has the burden to produce a non-discriminatory rationale for its actions.

The Post's proffered non-discriminatory rationale for Sherre Wilson's assignment to the day shift and the evidence it has put forward in support are the same here as that put forth in response to Desiree Wilson's claim of disparate treatment based on her assignment to the day shift. Further, in Sherre Wilson's case, the Post proffers through Raymond Walsh's affidavit that

the first time that Sherre Wilson applied to be transferred to the night shift, in May 2006, the Post granted the application. (R. Walsh Aff. ¶¶ 49-50.) Sherre Wilson has proffered nothing beyond her conclusory allegations to frame a genuine issue of material fact as to whether the proffered reason is a pretext for discrimination. Accordingly, the Post is entitled to summary judgment as a matter of law with respect to this claim.

Like Desiree Wilson, Sherre Wilson alleges that she was passed over for the temporary position assignments and for certain task assignments in favor of white male Juniors with lower priority. She identifies four pressmen with lower priority who were allegedly assigned ahead of her to be PIC and, like Desiree Wilson, alleges that when she began working for the Post, priority was respected with regard to PIC positions. She also identifies one white pressman who was assigned to be temporary Journeyman ahead of her and several while male Juniors with lower priority who were allegedly placed on the roller and production crew before her.

The McDonnell Douglas analysis of Desiree Wilson's disparate treatment claim with respect to the Post's proffered explanation for its position assignments applies equally here. With respect to Sherre Wilson specifically, the Post has proffered the testimony of dayside Pressroom Supervisor Brian Walsh that Sherre Wilson had "poor communication skills" and "did not work well with others," and accordingly was not suited for frequent assignments to the preferred positions. (B. Walsh Aff. ¶ 19.) The Post has also proffered that these determinations were made based on the foreman's observations of Sherre Wilson when she had been given opportunities on the production crew, and that Sherre Wilson was assigned to production several times on weekdays and weekends in 2004 and 2005. (B. Walsh Reply Decl. ¶¶ 3-4.) Sherre

Wilson has not proffered any evidence to substantiate her allegation that the <u>Post</u>'s practice of allowing foremen to exercise discretion in making position assignments is pretext to mask a discriminatory intent, nor has she proffered evidence that the practice has had a disparate impact generally.  Accordingly, the <u>Post</u> is entitled to summary judgment with respect to this claim.

Lastly, Sherre Wilson alleges that the <u>Post</u> imposed discriminatory discipline upon her.  Her claim is premised upon two incidents in which she received verbal warnings.  Sherre Wilson has not proffered any evidence to suggest that these verbal warnings resulted in "a materially adverse change . . . of the order of a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or the like."  <u>Shapiro v. New York Dep't of Educ.</u>, 561 F. Supp. 2d 413, 422 (S.D.N.Y. 2008).  Accordingly, she fails to state a *prima facie* claim.

In sum, the evidence on record, viewed in the light most favorable to Sherre Wilson, cannot support a rational fact finder's determination that Sherre Wilson has carried her burden of framing a genuine issue of material fact as to whether she was subjected to race or gender-based disparate treatment.  Accordingly, the <u>Post</u> is entitled to judgment in its favor as a matter of law on all of Sherre Wilson's disparate treatment claims.

III.    <u>Olivia Wilson's Disparate Treatment Claims</u>

Olivia Wilson asserts a disparate treatment claim premised upon her lack of assignments to the roller crew and the PIC position that echoes her sisters' claims discussed *supra*.  She specifically alleges that, throughout her employment at the <u>Post</u>, she was designated PIC on one occasion at the most, while various lower-ranking white male juniors were frequently selected to be PIC.

The <u>Post</u> specifically responds to Olivia Wilson's allegations by proffering, through the affidavit of Superintendent of the Pressroom Raymond Walsh, that in 2002 Olivia Wilson had only been on the job for a few months, and pressmen with such little experience are rarely selected to be PIC.  (R. Walsh Aff. ¶ 63.)  Olivia Wilson was away from work on maternity leave in 2003, and in 2004 she was selected to be PIC once.  On that occasion, according to R. Walsh, she "did not perform the job in a satisfactory manner."  (R. Walsh Aff. ¶ 61.)  Further, the <u>Post</u>'s general proffers regarding its practice of making PIC and roller crew assignments based upon the foremen's discretion apply with equal force here.  This is sufficient to shift the burden of production back to Olivia Wilson and compel her to provide the Court with sufficient evidence to frame a genuine issue of material fact as to whether the <u>Post</u>'s assignment practices are indeed discriminatory.  Olivia Wilson has proffered nothing in addition to what Desiree Wilson and Sherre Wilson proffered in this regard.  For the reasons stated in the analysis of Desiree and Sherre Wilson's disparate position assignment claims, Olivia Wilson has failed to meet this burden.

Olivia Wilson also asserts a discriminatory discipline claim premised upon an allegedly improper two week suspension imposed on January 14, 2005, for her purported commission of a "no-call/no-show" infraction.  She alleges that she did not commit a "no-call/no-show" but rather that she called to inform the <u>Post</u> that she would be out of work for the following two shifts, whereas the <u>Post</u> alleges that her call only provided notice that she would miss one shift.  Olivia Wilson also identifies four white male employees who allegedly received more lenient treatment and four black employees who each received similar two week

suspensions.  The Court assumes without deciding that Olivia Wilson has met her *prima facie* requirements with regard to the discriminatory discipline claim.

The <u>Post</u> proffers in response that the two week suspension was the mandated sanction according to the Office Rules in force during the relevant time period.  Plaintiffs and the <u>Post</u> disagree as to whether Plaintiffs were aware, or received proper notice, of the <u>Post</u>'s rule change that imposed stronger sanctions for "no-calls/no-shows" than for "call-ins."  The issue is not relevant to the Court's analysis, as the Court need only concern itself with whether the <u>Post</u> imposed the sanctions at issue based upon a legitimate, non-discriminatory reason.[17]  The <u>Post</u> proffers the affidavit of Raymond Walsh in which he states that he investigated the incident and concluded that Olivia Wilson had not provided adequate notification that she would not attend her work shift, and therefore he imposed the sanction warranted by the Office Rules.  (R. Walsh Aff. ¶ 85.)  The proffer that the suspension was imposed based on a good-faith, non-discriminatory application of the Office Rules – irrespective of whether Raymond Walsh's conclusion following his investigation was correct – is sufficient to shift the burden back to Olivia Wilson.  <u>See</u> <u>Milton v. Lenox Hill Hosp.</u>, 160 F. Supp. 2d 687, 696 (S.D.N.Y. 2001).

The <u>Post</u> also proffers evidence demonstrating that none of the white male pressmen whom Olivia Wilson alleges received more lenient sanctions than her were similarly situated to her: each of them either committed the same violation at a different time (when the rules in effect mandated a different sanction) or committed a different violation.  As for the black employees who received the same two week suspension as Olivia Watson, the <u>Post</u> proffers that

---

[17]     Plaintiffs have not alleged that the manner in which rule changes were communicated to pressmen was somehow discriminatory.

one of those punishments was the result of a clerical error and the others received the mandated punishments.  Further, the <u>Post</u> proffers evidence of white male pressmen similarly situated to Olivia Wilson who received the same sanction.  Olivia Wilson's conclusory allegation of discriminatory motive, and her inaccurate characterization of sanctions administered to others that fails to disturb the <u>Post</u>'s substantiated proffer that sanctions are consistently imposed based upon objective rules, are insufficient to frame a genuine issue of material fact.  No reasonable fact finder could conclude she has met her burden with respect to this claim, and accordingly the <u>Post</u> is entitled to summary judgment as a matter of law.

In sum, the evidence on record, viewed in the light most favorable to Olivia Wilson, cannot support a rational fact finder's determination that Olivia Wilson has carried her burden of framing a genuine issue of material fact as to whether she was subjected to race or gender-based disparate treatment.  Accordingly, the <u>Post</u> is entitled to judgment in its favor as a matter of law on all of Olivia Wilson's disparate treatment claims.

### IV.    Jerome Watson's Disparate Treatment Claims

Jerome Watson asserts the following disparate treatment claims: (i) he alleges he was passed over for production positions in a discriminatory fashion; and (ii) he alleges he was forced to give up the night shift and work the less desirable day shift upon being reinstated after his first termination; and (iii) he alleges he received a sanction for a "no-call/no-show" that was harsher than that imposed upon similarly situation white pressmen, and that his second termination also constituted a discriminatory, disparate punishment.

Watson's disparate treatment claim based upon his dissatisfaction with his assignments to the production crew is not premised upon any proffers in addition to those of the

other plaintiffs, and the Post's proffered non-discriminatory rationale applies with equal force.

Accordingly, for the reasons previously stated with respect to those claims, the Post is entitled to

summary judgment as a matter of law.  Watson also asserts that he was subject to disparate

treatment because he was given warnings for leaving his work station to use the restroom or

drink water without seeking permission.  The Post disputes whether Watson's allegation

identifies instances of disparate treatment; it proffers that all pressmen were subject to the same

rules and discipline in this regard.  (B. Walsh Aff. ¶ 47.)  The Court need not consider that

dispute further, as Watson has failed to allege that such warnings resulted in any consequence

that could constitute an "adverse employment action," and therefore the Post is entitled to

summary judgment as a matter of law on this claim.

Watson's claim premised upon his assignment to the day shift upon reinstatement

alleges an adverse employment action.  Watson has stated a *prima facie* case, as the record

substantiates his claim that assignment to the day shift could constitute an adverse employment

action, and his allegations that his supervisors discriminated against him are sufficient to meet

the minimal burden of raising an inference of discrimination.  The Post proffers a legitimate,

non-discriminatory reason for Watson's assignment to the day shift: according to two affidavits,

Watson had obtained an order of protection against night foreman Sanderson, and unless Watson

withdrew that order of protection, he could not work alongside Sanderson.  The Post proffers that

it offered Watson an arrangement in which he would be assigned to the night shift in exchange

for withdrawing the protection order, but that Watson refused to sign the agreement after initially

agreeing to it.  (Vincent Aff. ¶¶ 74-77, R. Walsh Aff. ¶ 52.)  At deposition, Watson conceded that

his protection order prevented him from working the same shift as Sanderson, and although he

said at deposition that he was willing to withdraw the order, he provides no evidence that he ever

actually did so.  (Watson Dep. 204-05.)  Accordingly, no reasonable finder of fact could conclude

that the <u>Post</u>'s proffered rationale for assigning him to the day shift is actually a pretext to mask a

discriminatory intent, and the <u>Post</u> is entitled to summary judgment as a matter of law on this

claim.

       Watson's first disparate discipline claim is premised upon a suspension he

received on March 12, 2004 (the "3/12/04 Suspension").  Watson adequately alleges a *prima*

*facie* case: he alleges that he received a two week suspension whereas similarly situated white

pressmen received lesser sanctions, and suspension without pay constitutes an adverse

employment action.  Although Watson's affidavit refers to the suspension as a two week

suspension, the evidence demonstrates that he was actually suspended for just one week (five

days), which amounted to two weeks away from the office when paired with Watson's one week

vacation previous to the week of suspension.  (Watson Aff. ¶ 12; Pls.' Ex. 24.)  The <u>Post</u> proffers

that the punishment imposed was proper under the rules in effect at that time and therefore was

imposed objectively and correctly.  The <u>Post</u> proffers undisputed evidence, in the form of the

affidavit of the Superintendent of the Pressroom Raymond Walsh and a copy of the Office Rules

applicable at the time, that demonstrates that a "no call/no show" warranted a five day

suspension.  (R. Walsh Aff. ¶¶ 75-77, Def.'s Exs. G, T.)  Watson objects that he provided the

<u>Post</u> with notice that he would not attend his shift and therefore he committed a "call in/call off"

rather than a "no-call/no-show."  Yet he concedes that he called less than two hours in advance

of the commencement of his shift, and accordingly the undisputed evidence demonstrates that he

committed a "no-call/no-show" under the <u>Post</u>'s Office Rules.  (Watson Aff. ¶ 12.)  Accordingly,

no reasonable finder of fact could conclude that the Post's proffered rationale for imposing the

3/12/04 Suspension is actually a pretext to mask a discriminatory intent, and the Post is entitled

to summary judgment as a matter of law on this claim.

Following the 3/12/04 Suspension, Watson committed another "no-call/no-show"

and received a two week suspension.  The Post proffers, through the affidavit of Raymond

Walsh, a copy of the rules in place at the time, and the letter sent to Watson announcing his

suspension, that the two week suspension was warranted by the rules and therefore was imposed

for a legitimate non-discriminatory reason.[18]  (R. Walsh Aff. ¶¶ 78-80, Def.'s Exs. H, U.)

Watson's conclusory allegation to the contrary is not sufficient to frame a genuine issue of

material fact regarding this claim.[19]

On June 25, 2004, Watson committed his third "no-call/no-show" within twelve

months.  This warranted Watson's termination according to the Office Rules in place at the time,

and Watson was fired.   (R. Walsh Aff. ¶ 81, Def.'s Ex. V.)  The Post proffers, through the

affidavit of Senior Vice President for Operations Vincent, a copy of the rules in place at the time,

---

[18]     In between these two infractions, the Post tightened the rules regarding "no-
call/no-shows."  As noted *supra*, the parties' dispute surrounding whether the
pressmen were aware, or were properly notified, of the rule change, is irrelevant to
the Court's determination as to whether the Post has proffered a legitimate non-
discriminatory rationale for its actions.

[19]     Watson's attempt to demonstrate that the Post imposed disparate sanctions on
black pressmen other than himself fails to undermine the Post's proffered non-
discriminatory rationale.  He alleges that another black pressman, Malone,
undeservedly received the penalty for a "no-call/no-show" when he had in fact
called in to report his planned absence.  This allegation relies entirely on hearsay,
as Watson's own statement in his affidavit provides the only support for the
alleged fact that Malone made such a call.  (Watson Aff. ¶ 13.)  The Post proffers
business records indicating that Malone in fact did not call.  (Def.'s Ex. JJJ.)

and the letter sent to Watson announcing his termination, that the penalty was warranted by the rules and imposed for a legitimate non-discriminatory reason.  (R. Walsh Aff. ¶ 81, Def.'s Ex. V.)  Watson supports his allegation that this proffered non-discriminatory rationale is a pretext for discrimination by proffering letters provided to white pressmen imposing milder sanctions for "no-call/no-shows."  (Pls.' Exs. 19-21.)  The <u>Post</u>, however, proffers undisputed evidence that none of those pressmen were similarly situated to Watson, and that numerous white pressmen who have been similarly situated (that is, have committed the same infraction under the same operative rules) have received the same sanctions.  (R. Walsh Aff. ¶¶ 82-84, R. Walsh Reply Decl. ¶¶ 32-35, Def.'s Exs. W, X, KKK, LLL, MMM.)  Based on this evidence, no reasonable fact finder could conclude that Watson's sanctions were imposed for discriminatory reasons, and accordingly the <u>Post</u> is entitled to summary judgment as a matter of law on this claim.

In sum, the evidence on record, viewed in the light most favorable to Watson, cannot support a rational fact finder's determination that Watson has carried his burden of framing a genuine issue of material fact as to whether he was subjected to race-based disparate treatment.  Accordingly, the <u>Post</u> is entitled to judgment in its favor as a matter of law on all of Watson's disparate treatment claims.

V.      <u>Plaintiffs' Hostile Work Environment Claims</u>

In addition to their disparate treatment claims, all of the Plaintiffs allege that they were subject to a hostile work environment at the <u>Post</u>.  In order to establish a hostile work environment claim under federal and New York state law, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  The

plaintiff must subjectively experience the working environment as abusive and the Court must be

satisfied objectively that it is abusive.  <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 745 (2d Cir.

2003).  Isolated instances of harassment ordinarily do not rise to the level necessary for a plaintiff

employee to avoid summary judgment on a hostile work environment claim.  Rather, the

employee must demonstrate either that a single incident was extraordinarily severe, or that a

series of incidents was sufficiently continuous and concerted, to have altered the conditions of his

working environment.  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000).  Relevant

factors in the Court's determination of whether such alteration of the conditions of an employee's

working environment has occurred include "the frequency of the discriminatory conduct; its

severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at

23.  Hostile work environment claims are evaluated by considering the totality of the

circumstances, <u>Quinn v. Green Tree Credit Corp.</u>, 159, F.3d 759, 767 (2d Cir. 1998), and the

Supreme Court has established demanding standards for plaintiffs asserting hostile work

environment claims in order to avoid construing Title VII as a "general civility code." <u>Faragher</u>

<u>v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998).

   Each of the Wilson sisters' hostile work environment claims fail because, taking

all the comments together and considering that they occurred over a number of years, they do not

rise to the level of actionable harassment, either on the basis of sex or race.  Desiree Wilson

alleges that Sanderson told her that training females is like "training dogs" and that "women need

to be horsewhipped."  Sanderson also allegedly said, in front of Desiree Wilson, that "You will

know who my wife is, she has red ink all over her dress."  Additionally, Desiree Wilson alleges

that foreman Kenny Eaton said, alluding to her, "I smell something. Whoof."  Lastly, Desiree

Wilson claims that foremen referred to black female celebrities as "whores" and "sluts" and

female employees are referred to as "girls."  No rational fact finder could conclude that these

allegations, considering the totality of the circumstances and the period of time over which the

incidents allegedly occurred, sufficiently altered the conditions of Desiree Wilson's working

environment to constitute a hostile working environment.[20]  Rather, such comments fit more

appropriately into <u>Harris</u>' category of "mere offensive utterance[s]."  510 U.S. at 23.

> The same rationale holds true for the comments allegedly directed at Sherre and

Olivia Wilson.  Sherre Wilson claims that she suffered a nervous breakdown after Brian Walsh

approached her and said that she would be fired if she did not improve her work.  She

additionally alleges that a <u>Post</u> foreman told <u>Post</u> security personnel not to speak or associate

with her because she was likely to file a sexual harassment charge against them.  Lastly, Sherre

Wilson alleges that a white male co-worker asked her to clean his house windows and that, on

September 3, 2003, she was belittled when she was told that she had "an able body to perform a

task outside [her] job description."  Olivia Wilson's hostile work environment claim is solely

premised upon two occasions when a foreman yelled at her and the general presence of photos of

scantily clad females on the pressroom walls.  Accordingly, Sherre and Olivia Wilson have failed

to raise a triable issue as to whether the comments made towards them were severe or pervasive

---

[20]     Plaintiffs also proffer various incidents in support of their hostile work
environment claims that rely entirely on hearsay allegations of comments heard or
actions witnessed by third parties.  The hearsay proffers are insufficient to
establish that these incidents actually occurred, and accordingly these allegations
cannot support Plaintiffs' hostile work environment claims.

enough to create a hostile work environment.  See Markus v. Teachers Ins. & Annuity Assoc.,
No. 03 Civ. 646, 2005 WL 742635, *8 (S.D.N.Y. Mar. 29, 2005) (holding that isolated instances
of harassment ordinarily do not rise to the level of a hostile work environment).

        Watson's hostile work environment claim is premised upon two allegations: that
Sanderson would rant and curse at him, and the Post did not discipline Sanderson for it; and that
Sanderson kicked and verbally abused Watson in one instance.  Watson's hostile work
environment claims with respect to Sanderson's behavior fail because no rational fact finder
could conclude that any of the alleged mistreatment Watson endured was inflicted on him
because of his race.  See Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) (holding that
"[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and
many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment
cases to exclude from consideration personnel decisions that lack a linkage or correlation to the
claimed ground of discrimination.")  Watson admits that Sanderson did not utter any racial
epithets or use other racially-tinged language to him, nor does Watson allege that he ever heard
Sanderson using any racially derogatory language.  The record is barren of any evidence to
substantiate Watson's conclusory allegation that Sanderson's actions were discriminatory, and
accordingly the Post is entitled to summary judgment as a matter of law on this claim.

      VI.    Plaintiffs' New York City Human Rights Law Claims

        Recent federal and New York state decisions hold that, subsequent to the New
York City Council's passage of the Local Civil Rights Restoration Act of 2005,  N.Y.C. Local
Law No. 85 of 2005 (Oct. 3, 2005) ("2005 Restoration Act"), "the City HRL's provisions [are] to
be construed more broadly than federal civil rights laws and the State HRL."  Williams v. New

York City Hous. Auth., 872 N.Y.S.2d 27 (1st Dep't 2009) (citing N.Y.C. Administrative Code §

8-130, as amended by the 2005 Restoration Act). While the precise contours of the amended

New York City Human Rights Law ("NYCHRL") and its analytical overlap with the familiar

Title VII analysis remain unclear, see Zakrzewska v. New School, 06 Civ. 5463, 2009 WL

252094, *7 (S.D.N.Y. Jan. 26, 2009) (certifying for interlocutory appeal the issue of whether "the

affirmative defense to employer liability [under Title VII] appl[ies] to sexual harassment and

retaliation claims under New York City Administrative Section 8-107"), analysis of the instant

claims under a broadly-construed NYCHRL compels the same result as that reached in the

analysis of Plaintiffs' claims under federal and state law.[21]

       The Court's conclusion that Plaintiffs have failed to frame a genuine issue of

material fact as to whether Defendant disciplined Plaintiffs in a discriminatory fashion or

assigned Defendants to their shifts and tasks in a discriminatory fashion applies with equal force

here. None of the 2005 Restoration Act's amendments to the NYCHRL altered the standard by

which a court should determine whether a discriminatory act has occurred in a manner relevant to

the instant claims, nor is the Court aware of any case law to that effect.[22] In any event, as the

---

[21]    Plaintiffs' submission in opposition to Defendant's motion for summary
judgment, filed in February 2007, does not address specifically the manner in
which the Court should construe their claims under NYCHRL, including the
important question of whether the 2005 amendments to the NYCHRL should be
applied retroactively. The Court assumes without deciding that the amendments
should apply retroactively, but notes that a contrary conclusion would preclude
application of the 2005 amendments to this case.

[22]    The 2005 Restoration Act added "partnership status" to the categories of
proscribed bases for discrimination, lowered the standard for a finding of an
unlawful retaliatory action, and urged broad construction of the NYCHRL
independent of a court's consideration of counterpart federal and New York state
statutes. See generally, Craig Gurian, A Return to Eyes on the Prize: Litigating

Court has concluded that there is no genuine issue of material fact as to whether Defendant acted in a discriminatory manner at all in respect to these claims, no construction of the NYCHRL, no matter how broad, would compel a different result.

    With respect to Plaintiffs' hostile work environment claims, the Court has concluded that the incidents identified by Plaintiffs are insufficient to rise to the level required to sustain a claim under federal and state law.  However, in <u>Williams</u>, the Appellate Division for the First Department held (in the context of alleged sexual harassment) that the distinction under federal law between actionable "severe or pervasive" conduct and non-actionable "mere offensive utterances" – the distinction relied upon in the Court's analysis of Plaintiffs' federal and state hostile work environment claims –  no longer applies under the NYCHRL.  Rather, the <u>Williams</u> court held that the inquiry under the NYCHRL should be "a focus on unequal treatment based on gender" to prevent "too much unwanted gender-based conduct to continue befouling the workplace."[23]  <u>Williams</u>, 872 N.Y.S.2d at *8.  The <u>Williams</u> court also recognized "an affirmative defense, whereby defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and inconveniences."  <u>Id.</u>   In the instant case, even when construing all the evidence in the light most favorable to Plaintiffs, and even when shifting the burden of proof to Defendant to prove its affirmative defense, the Court concludes that no reasonable fact finder could conclude that the alleged conduct amounts to more than such petty slights and

---

    *under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255 (2006).

[23]  The Court assumes that the same expansive analysis would apply to claims premised upon unwanted race-based conduct.

inconveniences. Accordingly, Defendant is granted summary judgment as a matter of law with respect to all of Plaintiffs' claims under the NYCHRL.

## CONCLUSION

Defendant's motion for summary judgment is granted in all respects. The Clerk of Court is respectfully requested to enter judgment in Defendant's favor and close this case. This Opinion and Order resolves docket entry no. 22.

SO ORDERED.

Date:     New York, New York
          March 31, 2009

LAURA TAYLOR SWAIN
United States District Judge